UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

DALE JOHNSON, ROSE JOHNSON,

          Plaintiffs,

  vs.

UNITED STATES OF AMERICA, et al.,

          Defendants.

NO. CV-09-259-JLQ

**ORDER RE DEFENDANT'S
RENEWED MOTION FOR
SUMMARY JUDGMENT**

BEFORE THE COURT is the Defendants Renewed Motion for Summary Judgment ("Renewed Motion") (C.R. 112). Plaintiffs have filed a Response in opposition (C.R. 121). The court has reviewed the supporting declarations and exhibits submitted by the parties.

## I. Background

Plaintiff Dale Johnson underwent a left-knee arthroscopy at a Veterans Administration Medical Center (VAMC) in Spokane, Washington on June 20, 2005. (C.R. 20 ¶ 1.2). Thereafter, Mr. Johnson was referred to VAMC-Puget Sound where he met with Dr. Chansky, who performed a left knee surgery in January 2006. (C.R. 20 ¶ 1.3 - 1.9). As part of the surgery, Mr. Johnson received a Zimmer unicompartmental component in his left knee. Post-surgery Mr. Johnson was experiencing "high pain" and "instability" of the knee. (C.R. 20 ¶ 1.10). Mr. Johnson saw Dr. Chansky for follow-up care in March and April of 2006. Mr. Johnson was unsatisfied with the care provided by Dr. Chansky on follow-up, and felt "neglected" or "abandoned" by Dr. Chansky. (C.R. 20 ¶ 1.11 - 1.13).

ORDER - 1

Mr. Johnson then saw Dr. Garland at VAMC-Spokane in November 2006, who performed a fluoroscopy of Mr. Johnson's left knee.  A second surgery was then performed on the left knee in January 2007, by a non-VAMC surgeon, Dr. Scott.

Mr. Johnson, and his wife, Rose Johnson, are both proceeding *pro se* as Plaintiffs and assert a variety of claims in their Amended Complaint. Mrs. Johnson works as a para-legal person.  Plaintiffs appear to assert six claims, ¶¶ 4.1 to 4.6, but the claim is essentially one of medical malpractice, with Mrs. Johnson's being essentially loss of consortium (see ¶ 1.33).  For example, paragraph 4.1 of the Amended Complaint attempts to assert "Loss of Chance and/or Employment and/or Self-Employment Due to Medical Provider Neglect of Duty."  Lost Chance of Employment is not a separate cause of action, rather Plaintiffs are asserting a measure of damages from the alleged malpractice. Plaintiffs' second claim entitled "Failure to Properly Obtain Informed Consent," is again a component of the alleged malpractice.  Although failure to secure informed consent could be considered a separate cause of action, with its elements delineated by RCW 7.70.050. Paragraphs 4.3 and 4.4 made additional allegations about the alleged malpractice. (C.R. 20 p. 7-8).  Paragraph 4.5 of the Amended Complaint, apparently Plaintiffs' fifth claim, is entitled "Vocational Rehabilitation and Employment and Medical," this paragraph asserts no discernible cause of action apart from the medical malpractice claim.  Similarly, Paragraph 4.6 asserts that the doctrine of *res ipsa loquitur* should apply--this is a theory of proof, not a cause of action.

## II. Procedural History

On April 15, 2010, Defendants filed a Motion for Summary Judgment accompanied by a statement of facts and supporting memoranda. (C.R. 31-34).  Plaintiffs filed a Response and supporting materials. (C.R. 49-51).  Plaintiffs additionally filed a Motion requesting that the court apply the doctrine of *res ipsa loquitur*. (C.R. 36).  A hearing was held on these motions on July 20, 2010, and the court issued an order that it would reserve ruling pending a settlement conference scheduled before Magistrate Imbrogno. (C.R. 61).

After the settlement conference proved unsuccessful, and after various motion practice concerning the disclosure of witnesses, the court denied Defendants' Motion for Summary Judgment on the basis that Plaintiffs had retained Dr. David F. Scott, a practicing orthopedic surgeon, who had signed a declaration supporting Plaintiffs' position. (C.R. 102).  Plaintiffs' request for a ruling on the doctrine of *res ipsa loquitur* was also denied as Plaintiffs had obtained an expert and because application of the doctrine is an evidentiary issue which could be revisited, if necessary, at a later time.

The deposition of Dr. Scott was taken on September 8, 2010, and after the deposition Defendants filed a Renewed Motion for Summary Judgment on the basis that Plaintiffs only expert witness, Dr. Scott, had retracted his prior opinions at deposition. (C.R. 112).  Plaintiffs additionally filed a "Motion for Relief" (C.R. 115) in which they acknowledge that in view of the deposition of Dr. Scott the court may "have no legal option but to grant the summary judgment."  The exact relief requested was unclear, other than Plaintiffs sought a prompt ruling as the trial date was then approaching. Plaintiffs additionally filed a declaration in which they stated they had informed defense counsel, "we will not submit an objection to the granting of summary judgment." (C.R. 116). Plaintiffs subsequently did file a Response to the Renewed Motion (C.R. 121) and Defendants have filed a Reply (C.R. 123).

### III.  Discussion

### A.  Have Plaintiffs Conceded the Merits of the Renewed Motion?

Plaintiffs, by submitting to the court that it may be required to grant summary judgment, and by informing defense counsel that they would not submit an objection to the granting of summary judgment, come close to conceding the entire matter.  However, given their *pro se* status, and given that they have filed a Response (C.R. 121) to the Renewed Motion and had previously opposed Defendants' original motion for summary judgment, the court finds they have not conceded the Renewed Motion and the court will proceed to address the merits.

**B.  Establishing a Medical Malpractice Claim Requires Expert Testimony**

Under Washington state law, in order for a plaintiff to recover for medical malpractice, he must show that injury resulted from the failure of a health care provider to follow the accepted standard of care. *Miller v. Jacoby,* 145 Wash.2d 65, 72 (2001); RCW 7.70.030(1).  He must show that the defendant "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he belongs, in the state of Washington, acting in the same or similar circumstances." *Id.*; RCW 7.70.040(1).  "Generally, expert testimony is necessary to establish the standard of care for a health care provider in a medical malpractice action." *Miller*, 145 Wash.2d at 72.

Defendants argue that they are entitled to summary judgment because the only expert disclosed by Plaintiffs, Dr. Scott, has now repudiated his prior opinions. Defendants argue: "[i]n an action for medical negligence, a doctor is entitled to summary judgment once he establishes the plaintiff lacks competent expert testimony," citing to *Morinaga v. Vue*, 85 Wash.App.822, 832 (1997).  Once a properly supported summary judgment motion has been made, the non-moving party may not simply assert that it will present evidence at trial. *Howard v. United States*, 2006 WL 2927727 *2 (W.D. Wash. 2006) ("The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.").  Defendants "can meet their initial burden by showing that the plaintiffs lack sufficient evidence to support their case[]." *Richter v. Rossmeisl*, 2002 WL 418162 (Wash.App. 2002).  "The burden then shifts to the plaintiffs to produce an affidavit from a qualified expert alleging specific facts that establish a cause of action." *Id.* at *2.

This court initially denied Defendants' Motion for Summary Judgment (C.R. 102) on the basis that Plaintiffs had obtained Dr. Scott as an expert witness and he had submitted a supporting Declaration.  Defendants filed the Renewed Motion after the deposition of Dr. Scott, and argue that he has retracted his opinions.  Thus, the testimony of Dr. Scott is the crux of this case.

**C.  Dr. Scott's Declaration and Deposition Testimony**

Dr. Scott signed a Declaration on August 25, 2010 (C.R. 99).  The Declaration stated that Mr. Johnson was referred to him after having undergone unicompartmental knee surgery at VAMC-Puget Sound.  A Zimmer implant was used.  The Declaration states that Mr. Johnson had "marked poor results" from the surgery and that early x-rays "revealed signs of early loosening."  Dr. Scott provided treatment to Mr. Johnson and performed revision surgery on January 16, 2007 in Spokane.

Dr. Scott stated his conclusions as follows:

1.  "It is my medical opinion, made with reasonable medical certainty that Dale's problems experienced were the direct and proximate cause of the Zimmer femoral component not being appropriately sized for his body (left knee) and the components being loose;" and

2.  "It is my further medical opinion, that it is a breach of the standard of care for a patient experiencing pain and functionality problems at three months post knee replacement, to not have differential diagnosis exams performed, which could include fluoroscopic, ct, bone scan or a number of radiological tests.  [Mr. Johnson] had none of these ordered for him prior to November, 2006." (C.R. 99).

Thus, on August 25, 2010, Dr. Scott apparently had concerns about the size and placement of the Zimmer component, and concerns about the post-operative care and testing, which caused him to conclude that there had been a breach of the standard of care.

At his deposition, just two weeks later on September 8, 2010, Dr. Scott acknowledged that he had signed the Declaration, and although he had not initially prepared it, he "read it very closely word for word," and added the language "and the components being loose," which is referenced above in paragraph 1. (C.R. 123-1, p. 45). However, Dr. Scott, when asked if he could say there was negligence in the operative care, stated it would be "impossible to say one way or another." (C.R. 123-1 p. 47-48). He elaborated that he could not say "for sure it's negligent," but "the parts were a little big

and they were grossly loose and that was in a year or less postop and that's pretty darn unusual to have that happen." (C.R. 123-1 p. 48-49).

Dr. Scott was then asked questions about specific health care providers. Concerning Dr. Chansky, who performed the first knee surgery in January 2006, he was asked:

Q.  Is it your opinion that Dr. Chansky provided care that in any way failed to meet minimum standard of care for doctors in this area?

A.  In reviewing all of the documents today, I cannot say with any degree of certainty that he violated the standard of care. (C.R. 123-1 p. 60-61). Dr. Scott similarly testified that he saw no breach of standard of care by Drs. Howland or Garland, and as to the VAMC generally he saw no "obvious violation" of the standard of care. (C.R. 123-1 p. 62-63).

On the issue of post-operative care and testing, Dr. Scott retracted his prior opinion when confronted with additional information.  Dr. Scott was asked questions about Mr. Johnson's hospital admission in March 2006 for infection concerns and about x-rays that were conducted.  Dr. Scott indicated he was not previously aware of the extent of the post-operative care: "Well, apparently, there were more exams performed than I was aware of." (C.R. 123-1 p. 55).  Faced with this new information, Dr. Scott stated he would be "forced to revise" his opinion and would "retract that statement of breach of standard of care." (*Id.* at p. 55-56).  Dr. Scott also did not support Plaintiffs' claim that Dr. Chansky had abandoned the care of Mr. Johnson.  Dr. Scott stated: "Dr. Chansky is a proxy for the VA Medical Center, clearly did provide ongoing care, and thus, did not abandon the patient." (*Id.* at p. 60).

Although it is clear that Dr. Scott had some concerns about Mr. Johnson's care and believed that perhaps the Zimmer component was oversized, that some of the early post-operative x-rays may have shown "obvious loosening that weren't identified appropriately," (*Id.* at 54) and that Mr. Johnson and Dr. Chansky had a "less than perfect doctor/patient relationship" (*Id.* at 58), Dr. Scott could not testify to a reasonable degree

ORDER - 6

of medical certainty that any of the Defendants had breached the applicable standard of care.

**D.  Dr. Bruce McDonald**

Dr. McDonald is a Texas physician who Plaintiffs attempted to retain as an expert witness.  Dr. McDonald apparently prepared a report at one time--according to Plaintiffs during the administrative process, and the letter opines that: "The selection and installation of the oversized prosthesis for Mr. Johnson was a deviation from acceptable standards of care." (C.R. 62).  However, Plaintiffs have apparently been unable to retain Dr. McDonald as an expert witness in this matter--perhaps due to his request for a $25,000 retainer. (C.R. 99).  In its Order of August 27, 2010, the court provided that he could be disclosed out of time if he was retained by September 3, 2010, and could be made available for deposition prior to the then trial date of September 27, 2010.  Dr. McDonald was apparently not retained, and not deposed, and is therefore not available to offer testimony in support of Plaintiffs' case.

As Dr. Scott is the only expert witness upon which Plaintiffs now rely, and he has no opinion, to a reasonable degree of medical certainty that the standard of care was breached, Plaintiffs cannot make a submissible case of medical malpractice, unless the doctrine of *res ipsa loquitur* applies.

**E.  Res Ipsa Loquitur**

Plaintiffs have argued throughout this proceeding that they are not required to present expert testimony because of the doctrine of *res ipsa loquitur*.  Plaintiffs argue that the Zimmer implant is a "foreign object" and that it spoke by saying "let me out of here; I don't belong here; and if I stay here I will continue to hurt you." (C.R. 51 p. 3).  Plaintiffs misunderstand the doctrine.

Under certain circumstances, "res ipsa loquitur can apply to physicians and hospitals." *Miller v. Jacoby*, 145 Wash.2d 65, 74 (2001).  The doctrine is "ordinarily sparingly applied, in peculiar and exceptional cases, and only where the facts and the demands of justice make its application essential." *Ripley v. Lanzer*, 152 Wash.App. 296,

308 (2009).  Whether the doctrine applies is a question of law. *Id.*  Three criteria must be satisfied to apply the doctrine: 1) the occurrence producing the injury must be of a kind which ordinarily does not occur in the absence of negligence; 2) the injury is caused by an agency or instrumentality within the exclusive control of the defendant; and 3) the injury-causing occurrence must not be due to any contribution on the part of the plaintiff." *Howard v. United States*, 2006 WL 2927727 *3 (W.D. Wash. 2006).  The quintessential case for *res ipsa* in the medical field is **inadvertently** leaving a foreign object in a patient's body. *Ripley*, 152 Wash.App. at 308 ("In Washington, courts have long recognized that inadvertently leaving a foreign object in a patient's body raises the inference of negligence.")

This is where Plaintiffs' res ipsa argument fails--Plaintiffs claim the Zimmer implant was the "foreign object" and that it spoke for itself by causing pain.  The Zimmer component was not **inadvertently** left in the knee cavity, rather that was the central purpose of the surgery.  Plaintiffs' argument that it was the wrong size is not within the knowledge of a lay person.  The complexity and intricacy of the sizing is seen by Dr. Arnold Peterson's Declaration in support of Defendants' position which states a prosthesis may protrude a few millimeters posterior to the femoral condyle as long as it does not overhang anteriorly, which would impinge on the patella. (C.R. 32-3).  Whether the Zimmer component was improperly affixed and why it became loose is also not something a lay person can determine, nor can a lay person determine whether such loosening would occur in the absence of negligence.  Loosening can occur for a variety of reasons: "Loosening of both partial and complete knee replacements is a known problem that occurs in many well done partial and complete knee replacements." Dec. of Dr. Peterson (C.R. 32-3).  Dr. Scott also agrees that loosening is not necessarily indicative of negligence. (C.R. 123-1 p. 21).

Plaintiffs' last allegation of negligence, concerning post-operative testing, is also not within the knowledge of a lay person.  A lay person cannot determine if the standard of care requires ordering an x-ray, or several x-rays, or fluoroscopic evaluation during

ORDER - 8

post-operative care.  Plaintiffs contend fluoroscopic evaluation should have been used more promptly, but Dr. Peterson no longer even considers fluoroscopic evaluation particularly useful. (C.R. 32-3).  Dr. Scott was also of the opinion that fluorocopy is not required by the standard of care, although it may be "helpful." (C.R. 123-1 p. 57). Plaintiffs need an expert, which they do not have, to establish the standard of post-operative care and whether that standard was breached.

The doctrine of res ipsa loquitur does not apply, and accordingly Plaintiffs were required to come forward with expert testimony in opposition to Defendants' Renewed Motion.  As Plaintiffs only expert, Dr. Scott, has retracted the statements in his prior Declaration and will not testify that there was a breach of the standard of care, Plaintiffs cannot establish a submissible case of medical malpractice.

### F.  Informed Consent

Paragraph 4.2 of Plaintiffs' Amended Complaint (C.R. 20) alleged Defendants failed to properly obtain informed consent and references RCW 7.70.050.  The allegations supporting this claim are largely conclusory assertions, which do not set forth the specific facts which Dr. Chansky allegedly omitted.  The most specific assertion is: "If Plaintiffs had been made aware of Dr. Chanksy's potential/possible 'lack of follow up care' policy, [Mr. Johnson] would have flat-out refused the surgery." (C.R. 20 p. 7).

Even where the allegation is failure to obtain informed consent, Washington courts have still required "some" expert testimony to determine whether the allegedly omitted information is material: "Some expert testimony is necessary to show this aspect of materiality because such facts are generally not describable without medical training." *Adams v. Richland Clinic, Inc.*, 37 Wash.App. 650, 658 (1984).  A physician does not have a duty to explain all possible risks, but only those of a serious nature. *Id.* at 656. The quantum of expert testimony required is apparently lower because "informed consent testimony need not rise to evidence of standard of care." *Id.* at 659.

As detailed above, Plaintiffs do not have a supporting expert.  And there is no evidence in the record that Dr. Scott or Dr. McDonald ever expressed an opinion

ORDER - 9

supportive of the claim of lack of informed consent.  There is evidence in the summary judgment record on the other side.  Dr. Peterson, having reviewed Mr. Johnson's medical records, states: "As part of Mr. Johnson's informed consent, he was told that the operation might fail to relieve his pain and he might need additional surgeries." (C.R. 32-3).  He further states: "The preoperative evaluation and informed consent provided to Mr. Johnson by Dr. Chansky met the standard of care." (C.R. 32-3).  Accordingly, the court must grant Defendants' Renewed Motion on this claim.

**IT IS HEREBY ORDERED:**

1.  Defendants' Renewed Motion for Summary Judgment (C.R. 112) is **GRANTED**.

2.  Defendants' Motion for Expedited Hearing (C.R. 109) and Plaintiffs' Motion for Miscellaneous Relief (C.R. 115) are **DENIED** as moot.

**IT IS SO ORDERED**.  The Clerk is hereby directed to file this Order, enter Judgment in favor of Defendants dismissing the First Amended Complaint and the claims therein with prejudice, furnish copies to Plaintiffs and counsel and close this file.

**DATED** this 5th day of October, 2010.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE